IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DANIEL LANDA-DUERTA; and<br>JORGE ARMANDO AVALOS-<br>MENERA,<br><br>Defendants. | CRIMINAL ACTION NO.<br>4:19-cr-00041-JPB-RDC-1, 3 |

**FINAL REPORT AND RECOMMENDATION**

Defendants Daniel Landa-Duerta and Jorge Armando Avalos-Menera were indicted on drug-related charges.[1] (Doc. 28). They have each moved to suppress cell phone evidence obtained following their warrantless detention on June 26, 2019. (Doc. 67; Doc. 68). Having fully considered the evidence, the applicable law, and the parties' written and oral arguments, the undersigned **RECOMMENDS** that Defendants' respective motions to suppress be **DENIED**.

**I.  BACKGROUND**

Over the course of three hearings, several witnesses testified on the

---

[1] Specifically, Defendants have been indicted for conspiracy to possess with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 (Count 1); and possession with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2 (Count 2). (Doc. 28). A third individual, Mauricio Dominguez-Vazquez, was also charged but subsequently pled guilty to both Counts. (Doc. 113).

Government's behalf, including the following members of the Paulding County, Georgia Sheriff's Office, all of whom were also members of a multi-jurisdictional drug task force: (1) Deputy Joe Horsley; (2) Agent Nathalie Whitener; and (3) Agent William Patrick Chappell. (Doc. 83; Doc. 125; Doc. 126). Credible testimony and other evidence adduced at the hearings showed the following.

On the evening of June 25, 2019, Deputy Horsley was alerted to a possible meth conversion operation located on a rental property at 809 Williams Road in rural Paulding County. (Doc. 83 at 13:18–14:15, 50:14–51:6). The property consisted of approximately 4 acres, complete with a house, a barn, and fencing along Williams Road. (Doc. 90-2; Doc. 90-3; Doc. 90-5; Doc. 90-6). Street access to the property was available via a gated driveway connecting to Williams Road. (Doc. 90-3; Doc. 90-5; Doc. 125 at 38:11–21, 118:16–22).

Although he didn't enter the house, the owner and landlord of the property observed several indications of drug activity during a recent unanswered visit. (Doc. 83 at 14:4–15, 50:14–51:6). Specifically, while walking the property and peering through the house's windows, he was able to detect a strong chemical smell, the sound of a large ventilation fan, and the presence of drums and small containers of a meth-like substance in the kitchen. (Doc. 83 at 53:9–54:8, 62:19–63:8, 64:16–25). After the owner reported these observations to police, Deputy Horsley, a 22-year veteran with experience investigating meth conversation labs, decided to seek a

search warrant for the property. (Doc. 83 at 9:9–13, 14:4–15, 64:2–25).

Because Deputy Horsley learned of the suspected drug activity late in the evening, he decided to pursue the search warrant early the next morning. (Doc. 83 at 34:25–35:4). But four officers were ordered to surveil the property in the interim. (Doc. 83 at 16:1–20). Starting at approximately 11:00 p.m. that night, Agents Whitener and Chappell patrolled the front of the property along Williams Road while two SWAT team members eyed the house from nearby woods. (Doc. 83 at 16:1–20, 33:15–18). Based on their positioning, these officers could detect any vehicle traffic to and from the property along Williams Road. (Doc. 125 at 127:8–23, 149:24–150:7). They maintained regular contact with each other and other law enforcement officers throughout the night and into the next day via text message and radio. (Doc. 83 at 46:10–25; Doc. 125 at 13:4–17, 46:7–23; Doc. 115-1). No activity was detected at the property that night. (Doc. 83 at 18:16–19, 33:3–6).

At approximately 7:00 a.m. the following morning, on June 26, 2019, Agent Chappell observed two Hispanic males arrive in a pickup truck with a trailer containing lawn equipment. (Doc. 125 at 39:11–40:4). The truck parked outside the property's fence-line near the gated driveway. (Doc. 125 at 40:5–10). Agents Chappell and Whitener observed one of the truck's occupants, who was wearing a reflective vest and later identified as Co-Defendant Mauricio Dominguez-Vazquez, use a weed eater to trim grass in the area. (Doc. 125 at 40:12–41:4). Agent Whitener

3

described the other truck occupant, who was later identified as Defendant Avalos-Menera, as a "larger person" with a "stocky build." (Doc. 125 at 41:5–13).

Just after 8:30 a.m., Agent Chappell drove past the property and observed a third Hispanic male wearing "gym shorts"—later identified as Defendant Landa-Duerta—walk down the driveway, while one of the SWAT team members advised that this same individual had unlocked the gate. (Doc. 125 at 50:5–9, 183:10–184:11). The truck then entered the property and parked near the house. (Doc. 125 at 58:9–59:19). Minutes later, at approximately 8:40 a.m., Deputy Horsley obtained a search warrant for the property, which specifically authorized the detention of any persons on the premises at the time of execution. (Doc. 83 at 18:8–12; Doc. 90-6). Shortly thereafter, at approximately 8:58 a.m., one of the SWAT team members still positioned in the woods communicated to the investigating team that two individuals were shuttling cardboard boxes between the truck and the house. (Doc. 125 at 57:9–60:15, 125:23–126:9).

Just after 9:00 a.m., the truck, which was driven by Dominguez-Vazquez, exited the property onto Williams Road and was stopped by an officer who had been stationed nearby. (Doc. 83 at 74:17–75:14). Following the stop, Dominguez-Vazquez repeatedly asked for his cell phone before attempting to run away. (Doc. 83 at 94:12–24, 99:10–12, 100:16–101:16). He was quickly apprehended, and the ensuing truck search revealed a large volume of meth—approximately 40

kilograms—located in cardboard boxes in the back. (Doc. 83 at 104:7–13, 117:18–23; Doc. 125 at 63:15–17; Doc. 90-16; Doc. 90-17). At approximately 9:50 a.m., one of the SWAT team members in the woods observed a male in gym shorts pacing in front of the house smoking a cigarette, and he shared a video and description of the individual to those involved in the operation. (Doc. 125 at 68:13–71:25).

Later, at approximately 10:20 a.m., the SWAT team member alerted officers that two men were walking down the driveway towards the gate. (Doc. 125 at 72:21–73:11, 75:25–76:16, 79:2–11). Based on the men's appearances—one was "heavier-set" and the other, who had changed into pants, appeared to be the same person seen earlier smoking a cigarette near the house in gym shorts—the SWAT member believed they were the individuals already observed at the property. (*Id.*). At that time, Deputy Horsley was en route to the scene with reinforcements to execute the search warrant and located just a couple of miles away. (Doc. 83 at 20:4–21:12). Fearing that the two men might elude law enforcement or destroy evidence, he instructed officers to stop and detain them. (Doc. 83 at 20:7–24).

Within minutes of Deputy Horsley's orders, Agent Whitener saw Defendants—identifiable based on prior descriptions—walking down Williams Road in front of the property. (Doc. 125 at 83:25–84:5, 86:11–88:5). Another officer then approached and stopped the pair. (Doc. 125 at 90:11–91:22). The officer confirmed with the SWAT team member positioned in the woods that, based on their

5

descriptions, these were the two men observed walking down the driveway minutes earlier. (Doc. 125 at 92:14–93:3). During questioning, Defendants indicated that no one else remained on the property at that time. (Doc. 125 at 111:4–8). They were detained and their cell phones—Landa-Duerta had one cellphone in his possession, while Avalos-Menera had three—were taken into custody until the property search could be completed.[2] (Doc. 125 at 102:4–104:25, 106:5–6, 107:13–108:23).

At approximately 10:30 a.m., just minutes after Defendants were detained, Deputy Horsley and other officers entered the property to execute the search warrant. (Doc. 83 at 19:1–3). No other individuals were present on the property, but officers detected the odor of acetone—used to process meth—and observed what appeared to be an active conversion lab inside the house, equipped with a portable burner, several propane tanks, a heated pot that was bubbling, and a tray covered with meth. (Doc. 83 at 22:21–25, 24:4–24, 26:4–21; Doc. 125 at 177:19–21; Doc. 90-19).

The property search was completed by 11:00 a.m., at which time Defendants were arrested and taken into custody based on evidence observed inside the house. (Doc. 83 at 28:15–22, 68:13–19; Doc. 125 at 114:21–115:5). Once they arrived at the Sheriff's Office, as per official Paulding County policy, all of their personal belongings were taken for safekeeping or placed into evidence. (Doc. 125 at 30:12–

---

[2] Officers did not search the cell phones at the scene, but instead waited days until search warrants were issued specifically for that purpose. Defendants are not challenging the validity of the cell phone warrants. *See* (Doc. 83 at 5:12–8:5).

6

21, 115:8–117:1).

## II.    THE PARTIES' CONTENTIONS

Defendants challenge their initial warrantless detention and the ensuing seizure of their cell phones. As to their detention, they argue that officers were not authorized to detain them pursuant to the property search warrant because they were in fact located *outside* the property at the time. Moreover, they continue, officers had no incriminating information—past or present—about either of them. Finally, Defendants maintain that their detention cannot be justified by concerns for safety or the destruction of evidence given that they were observed in plain sight and there was no indication that either presented a danger. Next, regarding their cell phones, Defendants argue that officers had no reason to believe the phones were stolen or had been used in connection with criminal activity, so their seizure was likewise unlawful and any evidence obtained therefrom should be excluded.[3] (Doc. 67; Doc. 68; Doc. 135; Doc. 136; Doc. 144).

In opposition, the Government maintains that Defendants' detention was justified because (1) they were located on the property when the search warrant was executed, (2) even if they weren't located on the property at that time, they were still

---

[3] Defendants filed independent suppression motions and briefs but their arguments are essentially the same, although Landa-Duerta focuses more on the initial detention while Avalos-Menera emphasizes the subsequent cell phone seizures. *Compare* (Doc. 135; Doc. 144), *with* (Doc. 136).

7

subject to detention under the search warrant because they were in the immediate vicinity, and finally (3) officers had at least reasonable suspicion—based on the landowner's initial report, the shuttling of boxes to and from the house, and the discovery of meth in the truck soon after it left the property—to believe that Defendants had engaged in criminal activity. With respect to Defendants' cell phones, the Government contends that exigent circumstances justified their seizure, but in any case, the phones would inevitably have been discovered and seized when Defendants were arrested. (Doc. 140).

### III.  DISCUSSION

After careful consideration, the undersigned concludes that officers did not violate the Fourth Amendment in this case. Each challenged aspect of law enforcement's actions—*i.e.*, Defendants' detention and the ensuing cell phone seizures—will be reviewed in turn.

#### A. The Detention

First, the undersigned finds that Defendants were lawfully detained because officers had probable cause at the time to believe they had engaged in criminal activity. The Fourth Amendment provides that a person has a right to be free from unreasonable searches and seizures. U.S. Const. Amend. IV. To determine whether a search or seizure is reasonable, a reviewing court must examine the totality of the surrounding circumstances. *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir.

2012).

Encounters between police and citizens are divided into three types, with escalating levels of Fourth Amendment scrutiny: "(1) police-citizens exchanges with no coercion or detention; (2) brief seizures or investigative detentions; and (3) full-scale arrests." *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011) (citation omitted). The measure of justification required to establish the reasonableness of each type of encounter varies, as explained by the Eleventh Circuit:

> The first category of police-citizen encounters fails to implicate fourth amendment scrutiny. The second category, investigative detentions, involves reasonably brief encounters in which a reasonable person would have believed that he or she was not free to leave. In order to justify a fourth amendment seizure, the government must show a reasonable and articulable suspicion that the person has committed or is about to commit a crime. Finally, if the totality of circumstances indicates that an encounter has become too intrusive to be classified as an investigative detention, the encounter is a full-scale arrest, and the government must establish that the arrest is supported by probable cause.

*United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989) (citations omitted).

With the preceding in mind, based on the collective knowledge of investigating officers at the time, the undersigned concludes that probable cause supported the detention of Defendants in this case. Probable cause exists "when law enforcement officials have facts and circumstances within their knowledge sufficient

9

to warrant a reasonable belief that the suspect had committed or was committing a crime." *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002) (citation omitted). Again, the inquiry looks at the totality of the circumstances. *See Illinois v. Gates*, 462 U.S. 213, 233 (1983). So, where there is at least minimal communication between different officers—as the evidence shows was the case here—the collective knowledge of officers determines probable cause. *See United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985). To verify whether probable cause existed to detain an individual, the court examines the events leading up to the detention and then decides "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quotations and citation omitted).

To recap the facts here, the owner of the house located at 809 Williams Road had recently observed several signs of possible drug activity inside—specifically, chemical smells, the sound of a ventilation fan, and the presence of drums and small containers of a meth-like substance in the kitchen. Deputy Horsley, with extensive experience in drug investigations, recognized these as signs of a meth conversion lab. Then, on the morning of June 26, 2019, in the hours leading up to the detention, officers observed three individuals at the property, two of whom were seen carrying cardboard boxes between the house—which, again, was a suspected meth lab—and a truck that arrived that morning. Finally, a short time later, one of the individuals

was stopped leaving the property in the truck with several cardboard boxes containing a large amount of meth. It was only *after* all of the above had taken place that Defendants—who, based on their appearances, were the only two other individuals on the property—were detained soon after exiting the property.

Based on the totality of the circumstances just described, the undersigned finds that officers had probable cause to detain Defendants. *Cf. United States v. Thomas*, No. 1:18-cr-141-MLB, 2021 WL 2886015, at *7 (N.D. Ga. July 9, 2021) (finding probable cause to support the defendant's warrantless arrest because his actions—including driving from a drug distribution site to meet known drug traffickers—showed "coordination with those undeniably involved" in drug activity). Law enforcement may take account of the fact that "[p]eople involved in the distribution of illegal drugs do not usually conduct business in the open or in front of strangers." *Id.* at *8; *see also United States v. Ashcroft*, 607 F.2d 1167, 1171 (5th Cir. 1979) (finding probable cause to arrest the defendant despite his claim of mere presence at a suspected location, noting that "a drug sale involving large quantities of cocaine is a private transaction that does not usually occur in the open or in the presence of strangers"). And here, Defendants together comprised two of the three individuals observed that morning acting in concert at a suspected meth lab, while the third was caught leaving the property with several boxes of meth that they themselves appeared to help load.

Because the Government has established that officers had probable cause to believe Defendants engaged in criminal activity, that alone is enough to make their detention pass muster under the Fourth Amendment. Accordingly, the undersigned **RECOMMENDS** that Defendants' motions to suppress be **DENIED** as to their detention.[4]

### B. The Cell Phone Seizures

Next, the undersigned likewise concludes that officers lawfully seized Defendants' cell phones when they were detained. Although the seizure of private property generally requires a warrant, the U.S. Supreme Court has interpreted the Fourth Amendment to allow a warrantless seizure when police can show both probable cause to believe that property contains evidence of a crime and an applicable warrant exception, such as exigent circumstances. *See, e.g., Kentucky v. King*, 563 U.S. 452, 459–60 (2011) (citations omitted).

Probable cause "is not a high bar," and requires only a substantial chance that evidence of criminal activity "will be found in a particular place." *United States v.*

---

[4] A few quick words on the Government's alternative arguments—first, the undersigned notes that, contrary to the Government's current urging, the search warrant had not yet been executed when Defendants were detained outside the property. *See* (Doc. 83 at 7:7–11 (counsel conceding search warrant had not yet been executed at the time of detention), 19:1–21:6 (officer conceding same)). So, the terms of the search warrant itself do not cover the detention. As for Defendants' proximity to the search site at the time of detention, in light of the probable cause finding above, the Court need not currently evaluate whether Defendants were near enough to justify detention under *Bailey v. United States*, 568 U.S. 186 (2013) (permitting officers executing a search warrant to detain persons in the "immediate vicinity" of the premises to be searched).

*Babcock*, 924 F.3d 1180, 1192 (11th Cir. 2019) (citation omitted). Meanwhile, the exigent circumstances exception permits warrantless seizures to prevent the imminent destruction of evidence. *See id.* at 1194–95. Officers relying on this exception must show an "objectively reasonable basis" for deciding that immediate action was required. *United States v. Young*, 909 F.2d 442, 446 (11th Cir. 1990). A reviewing court is tasked with determining whether the facts would have led "a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured." *Id.* (citation omitted).

Here, at the time officers seized Defendants' cell phones, their collective knowledge established probable cause to believe that a crime had been committed and, further, that evidence of that crime would be found on the cell phones. To start, as discussed above, officers had sufficient grounds to detain Defendants for suspected criminal drug activity. Next, the undersigned finds that officers also had probable cause to believe that there would be related evidence on their phones. Cell phones are, after all, "a known tool of the drug trade." *United States v. Lisbon*, 835 F. Supp. 2d 1329, 1363 (N.D. Ga. 2001) (citation omitted). And Defendants had several between them. *See United States v. Hernandez-Mendoza*, 600 F.3d 971, 977 (8th Cir. 2010) ("[D]rug traffickers typically carry multiple cell phones to allow for the disposal of one or more, if necessary to avoid detection.").

Moreover, officers had further reason to believe that Defendants might delete

any incriminating evidence on their phones before a warrant could be obtained. The type of evidence at issue—pictures, text messages, or contacts, for example—could have been quickly deleted if Defendants had their phones in hand. *See Young*, 909 F.2d at 446 ("[T]he need for the exigent circumstance doctrine is particularly compelling in narcotics cases, because contraband and records can be easily and quickly destroyed while a search is progressing."). And that was no abstract risk. Defendants had strong incentive to destroy such evidence, as they were obviously under suspicion when detained. Indeed, Dominguez-Vazquez—the third individual observed at the property that morning—sought to use his cell phone and flee police custody just a short time earlier when stopped by officers.

For these reasons, the undersigned finds that officers "faced with the potential destruction of evidence . . . did exactly what [the Eleventh Circuit] suggests they should have done—they seized the phone[s] to prevent the loss or destruction of [their] contents, and then obtained a warrant before searching through [them]." *Babcock*, 924 F.3d at 1195 (quotations and citation omitted). Accordingly, the seizure of Defendants' cell phones did not violate the Fourth Amendment. Therefore, it is **RECOMMENDED** that Defendants' motions to suppress also be **DENIED** with respect to the seizure of their cell phones.[5]

---

[5] Although it is evident that Defendants' cell phones would inevitably have been seized incident to their formal arrest, it is not necessary at present to fully discuss this alternative argument from the Government.

## IV. CONCLUSION

For all of the reasons presented above, the undersigned **RECOMMENDS** that Defendants' respective motions to suppress, (Doc. 67; Doc. 68), be **DENIED**. Because there are no other pretrial motions related to Defendants Daniel Landa-Duerta and Jorge Armando Avalos-Menera pending before the undersigned, this case is **CERTIFIED READY FOR TRIAL**.

IT IS SO **RECOMMENDED** on this 15th day of June 2022.

_R. Cannon_
REGINA D. CANNON
United States Magistrate Judge